IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DERRICK V. WILLIAMS,
      Petitioner,

vs.                                     Case No.: 4:05cv233/MMP/EMT

JAMES R. McDONOUGH,[1]
      Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1). Respondent filed an answer and relevant portions of the state court record (Doc. 14). Petitioner filed a reply (Doc. 16).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The procedural background of this case is undisputed by the parties and established by the state court record. Following a jury trial in the Circuit Court for Leon County, Florida, on March 29, 2001, Petitioner was convicted of armed robbery with a firearm, aggravated battery with a deadly weapon (firearm), and burglary of a dwelling while armed (Doc. 14, Ex. A at 21-25, Ex. B

---

[1]James R. McDonough succeeded James Crosby as Secretary for the Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d)(1).

at 316).   He was sentenced on June 12, 2001, to concurrent terms of fifteen (15) years of imprisonment with a ten-year minimum mandatory sentence imposed on each count (*id*., Ex. A at 33-41).   Petitioner appealed his convictions and sentences to the Florida First District Court of Appeal (First DCA).   Petitioner's appellate counsel filed a brief asserting that counsel was unable to make a good faith argument that reversible error occurred in the trial court, in accordance with Anders v. California, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967) (*id.*, Ex. D).   The appellate court affirmed the convictions and sentences per curiam without opinion on January 7, 2003, with the mandate issuing February 4, 2003 (*id.*, Ex. E).   Williams v. State, 835 So. 2d 1117 (Fla. 1st DCA Jan. 7, 2003) (Table).

On November 10, 2003, Petitioner filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 14, Ex. F at 1-29).   The motion was denied on May 6, 2004 (*id.*, Ex. F at 103-273).   Petitioner appealed the decision to the First DCA, and the appellate court affirmed the decision per curiam without written opinion on April 11, 2005, with the mandate issuing June 7, 2005 (*id.*, Ex. G).   Williams v. State, 902 So. 2d 799 (Fla. 1st DCA Apr. 11, 2005) (Table).

Petitioner filed the instant habeas action on July 3, 2005 (Doc. 1 at 10).   Respondent concedes that the petition is timely (Doc. 14 at 2).

II.   TRIAL EVIDENCE

Resolution of Petitioner's claims requires thorough consideration of the trial proceedings; therefore, a summary follows.   The theory of defense put forth by Petitioner's counsel in her opening statement was that Petitioner was not present when the crimes occurred (*see* Doc. 14, Ex. B at 49). Defense counsel argued that Petitioner was at home with his girlfriend, Lashondra Jones, when the crimes occurred; that he did not have transportation to leave the house; and that his physical description did not match the physical description of the robber (*see* Doc. B at 49-52).

The first witness called by the State was Deputy John Rudd.   Deputy Rudd testified he was on duty during the early morning hours of August 2, 2000, and at approximately 1:40 that morning, he responded to a report of a robbery at 5339 West Tennessee Street (*id*. at 52-54).   When he arrived at that location, he spoke with Mr. Billy Hall, who said he had been robbed of a sum of money at gun point by two individuals (*id*. at 54).   Mr. Hall told Deputy Rudd that one of the perpetrators was

a female who he knew as "Danielle" (*id*. at 55).  Mr. Hall and Deputy Rudd drove to an address identified by Mr. Hall as Danielle's mother's, and Deputy Rudd learned from the mother that the name of the female perpetrator was Sharron Danielle Cook (*id*.).  Deputy Rudd also learned that the telephone number of Mr. Hall's cellular phone was 509-2445, with an alternate business number of 575-7777 (*id*. at 56).  Mr. Hall's cellular telephone was reportedly taken in the robbery (*id*.).

On cross-examination, Deputy Rudd clarified that he received the call about the robbery at 1:47 a.m., that the caller stated that the robbery had just occurred, and that he arrived at the scene at 1:53 a.m. (*id*. at 57-58).

Billy Hall testified that on August 1, 2000, a woman who he knew as "Danielle" came to his residence at approximately 7:00 p.m. and asked to borrow money because she was hungry (*id*. at 61-63).  Mr. Hall took her to Applebee's, a local restaurant (*id*. at 63).  While they were at the restaurant, he allowed her to use his cellular telephone to make two or three calls (*id*. at 63-64).  He testified that he had allowed her to use his phone on several occasions (*id*. at 64).  Danielle then told Mr. Hall that she wanted to go to her mother's house, so he drove her there (*id*. at 65).  He waited in the car for approximately twenty minutes while Danielle was inside the house (*id*.).  Danielle then asked him to take her to Bicycle Road, which he did (*id*.).  Mr. Hall testified that Danielle got out of the car at Bicycle Road and was gone for approximately five minutes, then returned to the car, and they drove back to Mr. Hall's residence (*id*. at 65-66).  Mr. Hall estimated that it was approximately 9:00 p.m. when they arrived at his residence (*id*. at 66).  While at the home, Danielle used his telephone several more times, and at approximately 10:00 p.m., a vehicle arrived at the home, and Danielle left in the vehicle (*id*. at 66-67).

Mr. Hall testified that he went to sleep, but was later awakened by a knock at his door (*id*. at 67).  He answered the door, and it was Danielle, who asked him for money (*id*.).  Mr. Hall testified that he was groggy from medication he had taken, but he handed her two or three dollars in change (*id*. at 67-68).  Danielle then asked if her sister could use his bathroom, and Mr. Hall reluctantly agreed (*id*. at 68).  Danielle asked him for a key to unlock the front gate of the chainlink fence around his property, and he gave it to her (*id*. at 69).  Danielle then returned to the residence with a rather large, dark, black male who had "little pigtails" approximately 2-3" long all over his head, which Mr. Hall later learned were called dreadlocks (*id*. at 70-71).  Mr. Hall also noticed that

the man was holding a gun (*id*. at 70).  The man ordered Mr. Hall to lie on the floor and held the gun

to the nape of his neck, insisting that Mr. Hall give him all of his money (*id*. at 71).  The man then

began pushing him with the gun and demanded money (*id*. at 72).  Mr. Hall attempted to raise his

head to point to the location of the money, and the black man hit him in the back of the head with

the gun (*id*.).  Mr. Hall then told the man where the money was, and Danielle grabbed it (*id*.).  Mr.

Hall testified that approximately $5,000.00 was taken (*id*.).  He further stated that there was "no

question in [his] mind" that Danielle was acting with the man to rob him (*id*. at 73-74).  Mr. Hall

was told to stay on the floor for five minutes, but when he heard a vehicle leave, he got up and

reached for his cellular phone, but it was not there (*id*. at 74).  He testified that the number of the

cellular phone that was taken was 509-2455 (*id*.).

Mr. Hall then identified a portion of a cellular telephone bill as his, and the bill was admitted

into evidence, over defense counsel's objection (*id*. at 76-77).  Mr. Hall testified that the portion of

the phone bill included calls originating from his cellular phone on August 1 between 6:58 p.m. and

10:17 p.m. (*id*. at 78).  He also testified that he did not make those calls (*id*.).  No calls appeared on

the bill after 10:17 p.m. until August 9, when he received a replacement phone (*id*.).  Mr. Hall

testified that he did not recognize the number 850-322-1183 that appeared on the bill, nor did he call

that telephone number (*id*.).  He also did not recognize the number 709-0366 which appeared on the

bill (*id*. at 79).  Mr. Hall stated that he did not recall who called the number 322-1183 on July 31 at

2:51 a.m., but he suspected that Danielle made the call (*id*. at 79).  Mr. Hall testified that the money

taken from him was taken against his will, that he was fearful when the gun was placed to his head

and money was demanded of him, that he did not consent to being hit on the head, and that he did

not authorize anyone to enter his residence for the purpose of robbing him or committing any of the

other offenses against him (*id*. at 81).

On cross-examination, Mr. Hall testified that he did not recall seeing Petitioner before, and

that he could not say whether or not the robber was in the courtroom (*id*. at 82, 95).  He testified that

he had known Danielle for less than a month at the time the robbery occurred (*id*. at 83).  He stated

that he first met her at his place of business when she asked to borrow some money (*id*.).  He

testified that on one to five prior occasions he had loaned her money, and he denied that he ever

bought her crack cocaine, gave her money to buy crack cocaine, or gave her money to perform

sexual favors (*id*. at 84).  Mr. Hall testified that there was a mobile home park which people referred to as "Crack City" located behind his business and residence (*id*. at 85-86).  He stated that people would come from Crack City to his business and "borrow" money to buy cigarettes (*id*. at 86).  He stated that when he and Danielle went to Applebee's, he had approximately $5,000.00 in his pocket, and he assumed that she saw it (*id*. at 86).  Mr. Hall denied that Danielle ever lived with him, but testified that she left her shoes outside his gate on the night of the robbery, and she had previously left some articles of clothing in his residence (*id*. at 89-90).

The State's next witness was Tarek Thomas, a custodian of records for Sprint PCS (*id*. at 102).  Mr. Thomas testified that the electronic system at Sprint captures the origin and destination of telephone calls made to Sprint customers as the calls take place (*id*. at 105).  He testified that this information is reflected in the documentary business records produced for the State at its request (*id*.).  Mr. Thomas identified cellular phone records from the account of Lashondra L. Jones, and those records were admitted into evidence (*id*. at 105-06).  Mr. Thomas testified that the cellular phone number for Ms. Jones' account is 850-322-1183 (*id*. at 106).  He explained that the first column of the records showed the date and time that a call was initiated, the second column showed the telephone number from which the call originated, the next column showed the telephone number that was the destination of the call, and the next column was the duration of the telephone call (*id*. at 106-07).

Sharon Danielle Cook was the State's next witness.  She testified that she was criminally charged in connection with the robbery of Billy Hall (*id*. at 109-10).  She testified that there had been no "deals" or agreements made with her regarding her testimony, and that no one had made any promises to her as to what was going to happen in her case (*id*.).  She stated that she has known Mr. Hall for approximately one year (*id*.).  She testified that in July and August of 2000, she was using crack cocaine on a regular basis and was involved in prostitution (*id*.).  She stated that during the course of her acquaintance with Mr. Hall, she was at his residence on several occasions (*id*. at 111).  Ms. Cook testified that she had been staying at Mr. Hall's residence for three or four days prior to the robbery (*id*.).  She stated that during that time, Mr. Hall gave her money everyday, and she used it to buy drugs, alcohol, cigarettes, food, and clothing (*id*.).  She also stated that Mr. Hall gave her money in exchange for sexual favors (*id*. at 112).  She testified that on August 1, 2000, she

was using crack cocaine, and that she generally purchased it from a man she knew as "Terry" at the time, but she later learned that his name was Derrick Williams (*id*. at 112, 117).  She stated she had known "Terry" for almost one year, and she purchased drugs from him and assisted other people in purchasing drugs from him (*id*. at 113).  She further stated that when she wanted drugs, she called "Terry" on his cellular phone and told him what she wanted or asked him to meet her (*id*. at 114).  She testified that she knew "Terry's" cellular phone number and his pager number at the time of the robbery, but she could not recall the numbers at trial (*id*. at 113-14).  When she was shown the telephone records of Lashondra Jones, Ms. Cook recognized "Terry's" cellular phone number as 322-1183, and when she was shown Mr. Hall's telephone records, she recognized "Terry's" pager number as 709-0366 (*id*. at 115).

Ms. Cook testified that on August 1, 2000, she called "Terry" several times from Mr. Hall's cellular phone between 7:00 p.m. and 10:17 p.m. (*id*. at 115-16).  She also testified that she made the calls to "Terry's" pager number that were reflected in Mr. Hall's records (*id*. at 116).  Ms. Cook further testified that she called "Terry's" cellular phone several times earlier in the afternoon on August 1, 2000, from Mr. Hall's business telephone and his cellular phone (*id*. at 116-17).  She stated that Mr. Hall paid for at least $1,000.00 worth of crack cocaine for her that day (*id*. at 117).  Ms. Cook testified that after 6:00 p.m. on August 1, she and Mr. Hall went to Applebee's, and while they were there, she used Mr. Hall's cellular phone to call Derrick (a/k/a/ "Terry"[2]) (*id*. at 117-18).  She said that Derrick and his cousin "Jay" or "Rod" met her at Applebee's in a green truck and sold her drugs (*id*. at 118).   Ms. Cook stated that Derrick had borrowed the truck from Mr. Howard Head's girlfriend, and he paid back Mr. Head and his girlfriend with drugs and gas (*id*. at 125).  She stated that 10-15 minutes later, she and Mr. Hall left Applebee's and stopped at her mother's house (*id*. at 118).  By that time, Ms. Cook had consumed the drugs she purchased from Derrick and asked Mr. Hall to take her to Bicycle Road (*id*. at 118-19).  Mr. Hall took her there, and she bought more drugs from Derrick, and Derrick drove her to Mr. Hall's residence (*id*. at 119).  Ms. Cook removed her shoes and climbed over the fence around Mr. Hall's residence, she knocked on the door, and Mr. Hall let her in (*id*. at 120).  Ms. Cook testified that she told Mr. Hall that she wanted to buy more

---

[2]Ms. Cook used the names interchangeably.

drugs, and "Terry" was waiting for her (*id.*).  She testified that Mr. Hall responded that she had not been doing for him what he asked her to do, so she needed to get her belongings and leave (*id.*).  He then picked up her belongings and threw them at her (*id.*).  Ms. Cook stated that she opened the door to leave, and Derrick Williams "brought [her] back in" with a gun pointed at her head (*id.* at 121). She stated that she did not expect him to be outside (*id.*).  Ms. Cook testified that Derrick pointed the gun at Mr. Hall, and when Mr. Hall reached for the gun, Derrick pushed him to the floor (*id.* at 122).  Derrick told Mr. Hall that if he ever tried to grab him, he would shoot him (*id.* at 122).  Also, Derrick repeatedly asked Mr. Hall where his money was located (*id.*).  Mr. Hall attempted to get up to get the money, but Derrick hit him in the head (*id.* at 122-23).  Mr. Hall then stayed on the floor and asked Derrick not to hit him again or kill him (*id.* at 123).  Ms. Cook testified that a gun was also being held on her, and she stood there frozen in shock (*id.*).  She stated that Mr. Hall told Derrick the location of the money, and Derrick pointed at her and told her to get it (*id.* at 123-24). She testified that she grabbed the money and Derrick snatched it out of her hand and also grabbed Mr. Hall's cellular phone (*id.* at 124).  She stated that as she was trying to leave through the door, Derrick grabbed her and said, "You're not going nowhere [sic].  You're involved in this now." (*id.* at 124).  Ms. Cook testified that Derrick pushed her out the front door, followed her to the car with the gun, and then forced her into the car with the gun (*id.* at 124, 127).  She stated that the gate was wide open, but Mr. Hall had not given her a key (*id.* at 124-25).  Ms. Cook testified that they drove near Bicycle Road, and she started to grab the door handle to jump out, but Derrick pushed her out of the car (*id.* at 127).

Ms. Cook stated that the next day, Officer Strickland arrested her for armed robbery (*id.* at 128).  She stated that she did not have anything to do with the robbery, but she later admitted that she was present when the robbery occurred (*id.* at 128-29)  She further stated that she first told Officer Strickland that she did not know who the robber was, but she later told him that the robber was "Terry" (*id.* at 129-30).  Ms. Cook also described to Officer Strickland the vehicles that "Terry" typically used (*id.* at 130).  Ms. Cook then identified a picture of "Terry" as he looked on the night of the robbery (*id.* at 131).  Ms. Cook identified Petitioner as the man she knew as "Terry" and later learned was Derrick Williams (*id.* at 133).

On cross-examination, Ms. Cook denied that she participated in the robbery and speculated that Mr. Hall implicated her because she would not comply with his wishes to give him sexual favors (*id*. at 133). Ms. Cook testified that she stayed with Mr. Hall on several occasions, and he had told her she could stay with him three days prior to the robbery (*id*. at 138). She further stated that several of her belongings were at his residence (*id*. at 138-39). Ms. Cook testified that Derrick Williams gave her his cellular phone number (*id*. at 139). She denied that Mr. Hall gave her a key to open his gate, and she denied that she told him that her sister was outside and needed to use the telephone (*id*. at 140). Ms. Cook testified that there were two guns involved, one pointed at her, and the other pointed at Mr. Hall (*id*. at 142-43). Ms. Cook also testified that while she was in jail, she wrote letters to a friend, Mr. James Colston (*id*. at 146-47). The prosecutor objected to further questioning by defense counsel regarding those letters on relevancy grounds, and after a sidebar conference, defense counsel agreed not to question witnesses regarding the letters (*id*. at 147-51).

The cross-examination of Ms. Cook resumed. Ms. Cook testified that Mr. Hall had previously given her money for her and other women to perform sexual acts in his presence (*id*. at 152). She further testified that Petitioner had dreadlocks at the time of the robbery (*id*.). Ms. Cook testified that Petitioner constantly returned her calls when she called him (*id*. at 157).

The State's next witness was Raushanah Inas Aqeel. Ms. Aqeel testified that in July and August of 2000, she owned a green 1996 Ford Ranger truck (*id*. at 163). She also testified that she was dating Mr. Howard Head at that time (*id*.). She stated that during that time, she loaned her truck to a man whom she knew as "Terry" (*id*. at 164). She identified a photograph of Petitioner as "Terry," and she identified Petitioner in court as that man (*id*. at 164-65). She stated that "Terry" would give her money in exchange for use of the truck (*id*. at 165). Ms. Aqeel was shown a copy of the telephone records for Lashondra Jones' cellular phone and recognized her (Ms. Aqeel's) telephone number on the records (*id*. at 165).

Detective Strickland testified that he took Ms. Cook into custody on August 3, and he questioned her regarding the robbery (*id*. at 170). He stated that she initially denied being present at the robbery, but then admitted being there (*id*. at 171). Based upon the information provided by Ms. Cook, Detective Strickland located Mr. Howard Head and his girlfriend, as well as a green truck, at the address provided by Ms. Cook (*id*. at 171). Detective Strickland testified that as part

of his investigation, he attempted to make "controlled" telephone calls to the telephone number 850-322-1183, with a Sheriff's Department cellular phone (*id*. at 171-73). Strickland stated that Ms. Cook used his phone to place two calls to that number: the first time she called, a male spoke with her and denied knowing anything; the second time she called, she spoke with a young lady (*id*. at 172). Detective Strickland testified that thirty minutes later, he received a call on the same phone and spoke with a young lady (*id*.). He said that he told her he was looking for a 6'2" or 6'3" black male weighing 230-240 pounds with dreadlocks, but the woman said she did not know anyone who fit that description (*id*. at 173). Detective Strickland then identified himself, and in a second conversation with the woman, she said that the man he was describing was her fiancee, Steve (*id*. at 173). The prosecutor showed Detective Strickland a copy of Lashondra Jones' telephone records, and he identified the Sheriff's Department cellular phone number, 567-1164, as the initiator and the receiver of calls from Ms. Jones' phone on August 3 (*id*. at 173-74). He also recognized Ms. Aqeel's phone number as the initiator and receiver of approximately twenty-seven calls to and from Ms. Jones' phone (*id*. at 174-75).

On cross-examination, Detective Strickland testified that early in the investigation, he may have received information that the robbery suspect was smaller, but he could not recall the source of the information (*id*. at 179, 186-88). He stated that Deputy Rudd's reopt stated that the suspect was 6'1' and weighed 240 pounds (*id*.). Detective Strickland testified that Billy Hall told him that he believed Ms. Cook was playing an active role in the robbery, and that he had given Ms. Cook a key to his gate (*id*. at 181). He also testified that Billy Hall told him that the robber was a black male, 25-30 years old, 6'1" in height, and weighing approximately 240 pounds, with dreadlocks approximately five inches in length (*id*.). Detective Strickland testified that Mr. Hall and Ms. Cook gave him conflicting statements regarding whether Mr. Hall or someone else drove her (Ms. Cook) from Bicycle Road to Mr. Hall's residence on the night of the robbery (*id*. at 183-84).

The State rested its case, and defense counsel moved for a judgment of acquittal on all three counts. The court denied the motion.

The first witness for the defense was Petitioner's mother, Faye Gibbs Davis. She testified that Petitioner is her son, and Lashondra Jones was his fiancee, but she is now his wife (*id*. at 191). Ms. Davis testified that she took Petitioner to meet with Detective Strickland, and Detective

Strickland stated that he was looking for a black male with 2" dreadlocks, approximately 5'7" - 5'10" tall and weighing 175-185 pounds (*id*. at 194). Ms. Davis stated that Petitioner is 6'5" tall, weighs 250 pounds, and has 5" dreadlocks (*id*. at 194-95).

The next defense witness was Lashondra Jones. She testified that she is Petitioner's wife (*id*. at 199). She testified that on August 1, 2000, at approximately 8:00 p.m. she began twisting Petitioner's hair into dreadlocks (*id*. at 200-01). She stated that she finished his hair at approximately 4:00 a.m. the next morning (*id*. at 201). She further testified that neither she nor Petitioner left the house that night (*id.*). She stated that Petitioner called Howard Head and asked him to pick them up to get something to eat, but Mr. Head stated that his girlfriend would not allow him to use her truck (*id.*). Ms. Jones stated that Petitioner borrowed Mr. Head's truck the next day around lunch time (*id*. at 205).

On cross-examination, Ms. Jones testified that Rodney Virgil, Petitioner's friend who he referred to as his cousin, drove Petitioner to Howard Head's house on August 2 to borrow the truck (*id*. at 206). Ms Jones testified that her cellular phone number is 322-1183, and she acknowledged that Detective Strickland called her on that number (*id*. at 208). She also testified that both she and Petitioner used the cellular phone (*id*. at 212). The prosecutor then asked Ms. Jones whether she recognized several numbers that appeared on her cellular phone records on August 1 and 2, including Mr. Hall's cellular phone number and business number, Ms. Aqeel's number, and Rodney Virgil's number, but she only recognized Rodney Virgil's number (*id*. at 213-24). She testified that on August 1 on two occasions Petitioner answered a call received from 509-2455, including a call at 10:04 p.m. that lasted 227 seconds (*id*. at 220). Ms. Jones stated that the caller was a white female asking for drugs, and Petitioner told her not to call his number anymore (*id*. at 220-21). There were no phone calls made from or received by Ms. Jones' cellular phone after 11:35 p.m. on August 1 (*id*. at 223). Ms. Jones testified she took some calls from 575-7777, but the person was asking for Terry, and she didn't know who they were talking about (*id*. at 217). When the prosecutor asked her why Ms. Aqeel knew Petitioner as Terry and she (Ms. Jones) did not, Ms. Jones replied, "Maybe she knows something that I don't." (*id.*).

On re-direct, Ms. Jones testified that she and Petitioner were at home on August 1 and the morning of August 2 (*id*. at 226).

Rodney Virgil testified that Petitioner did not have transportation on the night of August 1 through the morning of August 2, because he asked Petitioner to bring him some alcohol, but Petitioner could not (*id*. at 227-28).

On cross-examination, Mr. Virgil admitted that he had been previously convicted of more that two felonies (*id*. at 228-29). He also testified that Petitioner frequently drove a green pickup truck belonging to Howard Head's girlfriend, Raushanah (*id*. at 229). He also testified that he was not aware of Petitioner's using a nickname "Terry" (*id*.). Mr. Virgil testified that Petitioner did not compensate Raushanah for his use of her truck (*id*. at 229-30). He stated he called Petitioner during the nighttime of August 1, and Petitioner was getting his hair "dreaded up" (*id*. at 230-31). When Mr. Virgil viewed the phone records from Lashondra Jones' phone, he testified that he called Petitioner at 6:30 p.m. on August 1 (*id*. at 232). Mr. Virgil stated he had not talked to Lashondra Jones during the pendency of the criminal case (Ms. Jones had testified that she began doing Petitioner's hair at 8:00 p.m.) (*id*.). Mr. Virgil testified that he did not talk to Petitioner on the phone after 6:30 p.m. on August 1, and he denied that he went to Applebee's with Petitioner that night (*id*. at 234).

Howard Head testified that Detective Strickland visited his residence, told him that the green Ranger pickup truck was used in an armed robbery, and asked if he knew anything about it (*id*. at 238). Mr. Head stated that Detective Strickland threatened that if he did not cooperate with him, and he would make sure he went to prison for a long time (*id*. at 238-39). Mr. Head further stated that Detective Strickland told him that the robber was 5'7" tall and weighed 150-60 pounds (*id*. at 239). Mr. Head testified that he knew Sharron Danielle Cook and knew that she was a hooker who tried to get him to "trick" with her, that she was a crack addict, and that she stole money from him (*id*. at 241-42). Mr. Head stated that he knew Petitioner, and Petitioner would never rob anyone (*id*. at 242).

On cross-examination, Mr. Head admitted that he had been previously convicted of possession with intent to sell cocaine, as well as another felony and a violation of probation (*id*. at 248). Mr. Head stated that he knew the name of the man who borrowed Ms. Aqeel's green truck as "T" or "D" or "Dread" (*id*. at 250). He testified that Ms. Aqeel received crack cocaine in

exchange for the man's use of the truck (*id*.).  Mr. Head testified that after the robbery had occurred, the next time that Petitioner borrowed the truck was on August 3 (*id*. at 251).

James Colston testified that he was a friend of Sharron Danielle Cook, and that he had heard about the robbery in which she was allegedly involved (*id*. at 261).

Defense counsel then called Billy Hall as a witness (*id*. at 264).  He testified that he was not sure whether he had ever seen Petitioner before (*id*.).  He stated that he did not see him at Applebee's on the day he was there with Ms. Cook (*id*.).  He further stated that he briefly saw the face of the man who robbed him, but the room was not well lit, and he could not positively identify him (*id*. at 264-65).  He also testified that he saw only one gun that night (*id*. at 265).

The defense rested its case.  After less than two hours of deliberations, the jury returned guilty verdicts on all three counts (*id*. at 314-16).

## III.   STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States."  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254 now provides:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
 (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
 (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test in habeas cases was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412–13; Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding.  See Wellington v. Moore, 314 F.3d 1256, 1260–61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343–45 (11th Cir. 2002).  First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication.  Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343.  Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law.  Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344.  "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent."  Wellington, 314 F.3d at 1260 (quoting Fugate v. Head, 261

---

[3]Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99, 120 S. Ct. at 1499–1503, 1511–16); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13, 120 S. Ct. at 1518–23).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting Williams, 529 U.S. at 405)).  "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404–06).  If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority."  Fugate, 261 F.3d at 1216.  Likewise, if the facts of the Supreme Court cases and the petitioner's case are not substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  *Id.* (citing and quoting Williams, 529 U.S. at 406)  A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 410.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'"  Bell v. Cone, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) (quoting Williams, 529 U.S. at 411).  Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003).  A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that [the state court] judgment is infected by constitutional

error." <u>Williams</u>, 529 U.S. at 389. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) (citation omitted). Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent. <u>Van Poyck v. Fla. Dep't of Corrections</u>, 290 F.3d 1318, 1322 n.4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." § 2254(e)(1); <i>see</i> <u>Miller-El v. Cockrell,</u> 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).") (dictum); <u>Fugate</u>, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); <u>Parker v. Head</u>, 244 F.3d 831, 835–36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); <i>see also</i> <u>Crawford v. Head</u>, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations). Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence. <i>See</i> <u>Callahan v. Campbell</u>, 427 F.3d 897, 926 (11th Cir. 2005) (citing § 2254(e)(1); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1308 (11th Cir. 2004) ("[Petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record.")).

IV.    EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[4] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas

---

[4]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
         (A)  the applicant has exhausted the remedies available in the courts of the State; or
         (B) (i)  there is an absence of available State corrective process; or
              (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Id.* (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  *Id.* at 7 & n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364 (1995).  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[5]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Id.* at 365–66.  Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).  The Baldwin Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in

---

[5]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  *Id.*  With regard to this statement, the Eleventh Circuit stated in <u>McNair v. Campbell</u>, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"<u>McNair</u> [v. Campbell], 315 F. Supp. 2d at 1184 (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[6]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review.  <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* <u>Coleman v. Thompson</u>, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 2555 & n.1, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* <u>Tower v. Phillips</u>, 7 F.3d 206, 210 (11th Cir. 1993); <u>Parker v. Dugger</u>, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's

---

[6]In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  <u>McNair v. Campbell</u>, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  *Id.*

procedural default doctrine. <u>Bailey</u>, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id*. A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See* <u>Harris v. Reed</u>, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. <u>Lee v. Kemna</u>, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[7] *Id.* Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

A petitioner can overcome a procedural default in two narrow circumstances. The petitioner must either show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. <u>Henderson v. Haley</u>, 353 F.3d 880, 892 (11th Cir. 2003); <u>Tower</u>, 7 F.3d at 210; <u>Parker</u>, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." <u>McCleskey v. Zant</u>, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. <u>Tower</u>, 7 F.3d at 210. Furthermore, the Eleventh Circuit has held that because there is no constitutional right to an attorney in state post-conviction proceedings, any ineffectiveness of post-conviction counsel cannot be "considered cause for the purposes of excusing

---

[7]The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. <u>Marek v. Singletary</u>, 62 F.3d 1295, 1301–02 (11th Cir. 1995); <u>Alderman v. Zant</u>, 22 F.3d 1541, 1549 (11th Cir. 1994).

. . . procedural default that occur[s] . . . at the state collateral post-conviction level." <u>Henderson</u>, 353 F.3d 892 (citing 28. U.S.C. § 2254(i); <u>Coleman v. Thompson</u>, 501 U.S. 722, 752 (1991); <u>In re Magwood</u>, 113 F.3d 1544, 1551 (11th Cir. 1997); <u>Johnson v. Singletary</u>, 938 F.2d 1166, 1174–75 (11th Cir. 1991)).  To establish prejudice, a petitioner must show that there is "at least a reasonable probability that the result of the proceeding would have been different."  *Id.*

Alternatively, to satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  <u>Schlup</u>, 513 U.S. at 327.  Further,

> [A] substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

V.    PETITIONER'S CLAIMS

 A.    <u>Ground one:  Ineffective assistance of counsel for failure to request jury instruction dealing with accomplice's testimony.</u>

(Doc. 1 at 4).  In Ground one, Petitioner contends he received ineffective assistance of counsel because defense counsel failed to request a jury instruction regarding testimony by an accomplice. Petitioner states that Sharon Cook, an accomplice, testified that Petitioner was the robber, and this testimony was the only direct evidence of his guilt (*id.*).  Petitioner argues that if counsel had requested the cautionary instruction, there is a reasonable probability that the result of the trial would have been different because the jury would have found his alibi defense credible (*see* Doc. 1 at 4; Doc. 16 at 7).  Respondent concedes that Petitioner exhausted his state court remedies as to this claim (Doc. 14 at 11).

 1.    Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief

under Strickland, a petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  466 U.S. at 687-88.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  Strickland, 466 U.S. at 697.  Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied.  Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003), cert. denied, 541 U.S. 1034, 124 S. Ct. 2104, 158 L. Ed. 2d 718 (2004); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." (citation omitted)).

    With regard to counsel's performance, the Eleventh Circuit has stated:

>    Trying cases is no exact science.  And as a result, we must never delude ourselves that the fair review of a trial lawyer's judgment and performance is an activity that calls for great precision or for a categorical approach.  When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate."  Atkins v. Singletary, 965 F. 2d 952, 958 (11th Cir. 1992).  And, "a court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy."  Devier v. Zant, 3 F. 3d 1445, 1450 (11th Cir. 1993).  Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it can be shown that no reasonable lawyer, in the circumstances would have done so.

Rogers v. Zant, 13 F. 3d 384, 386 (11th Cir. 1994); Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (to show counsel's performance was unreasonable, defendant must establish that no competent counsel would have taken the action that his counsel did take); Chandler, 218 F.3d at 1313 (issue is not what is possible, prudent, or appropriate, but what is constitutionally compelled) (citing Burger v. Kemp, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)).

    However, not every strategic decision passes constitutional muster.  Whether a particular decision by counsel was a tactical one is a question of fact, Hardwick v. Crosby, 320 F.3d 1127,

1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness.  *See* 28 U.S.C. § 2254(e)(1); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether a particular tactical decision was a reasonable one, however, is a question of law, Hardwick 320 F.3d at 1163; Jackson, 42 F.3d at 1367; Horton, 941 F.2d at 1462.  In determining whether counsel's decision was reasonable, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high.  Wellington, 314 F.3d at 1260.  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Id.* (quoting Strickland, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693-94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405-406.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694-95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only

weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695-96.

2.     Federal Review of State Court Decision

Petitioner presented this claim as his third ground for relief in his Rule 3.850 motion (Doc. 14, Ex. F at 8-9). The state court's written opinion included the following evaluation of Petitioner's claim:

The defendant next alleges counsel was ineffective for failing to request an accomplice instruction regarding Ms. Cook. The record in this case shows counsel for the defendant attacked the credibility of Ms. Cook's testimony and questioned her participation in the crime. See Attachment 3. Additionally, the testimony offered by Ms. Cook was not completely uncorroborated. Ms. Cook's testimony was circumstantially corroborated by the description of the suspect which was provided by the victim and by the phone records introduced into evidence. Counsel's opening statement, cross examination of the witness, and the standard jury instructions concerning reasonable doubt and the burden of proof effectively attacked the testimony offered by this State's witness. See Hutchins v. State, 311 So. 2d 198 (Fla. 3d DCA 1975); Boykin v. State, 257 So. 2d 251 (Fla. 1971). Accordingly, the defendant's claim fails to sustain its burden under Strickland in showing counsel acted ineffectively, effecting [sic] the outcome of the proceedings.

(Doc. 14, Ex. F at 105).

The state court correctly identified the two-prong Strickland standard as applicable to claims of ineffective assistance of counsel (*id*. at 103-04). Additionally, the state court's factual findings are presumed correct as Petitioner has failed to rebut those findings with clear and convincing evidence. Therefore, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable application of Strickland.

The Florida standard jury instruction regarding testimony by an accomplice is the following:

3.9(B) ACCOMPLICE

> You should use great caution in relying on the testimony of a witness who claims to
> have helped the defendant commit a crime.  This is particularly true when there is no
> other evidence tending to agree with what the witness says about the defendant.
>
> However, if the testimony of such a witness convinces you beyond a reasonable
> doubt of the defendant's guilt, or the other evidence in the case does so, then you
> should find the defendant guilty.

Florida Standard Jury Instructions in Criminal Cases, Fourth Ed., Pt. One:  General Instructions, Ch.
3 Final Charge to the Jury.

As the state court noted, Ms. Cook's testimony was corroborated by the phone records
introduced into evidence and by the victim's physical description of the suspect.  Additionally, in
the prosecutor's opening statement, he told the jury that Ms. Cook had been arrested in connection
with the robbery and that although there were no "deals" between the State and Ms. Cook, she was
probably testifying with the hope that the court would show leniency in her case (Doc. 14, Ex. B at
41-43).  Defense counsel brought out and thoroughly argued the facts showing Ms. Cook's strong
motive to lie.  In counsel's opening argument she pointed out to the jury that the evidence would
show:  (1) Ms. Cook was a drug addict who had friends who were also drug addicts and lived near
the victim's residence; (2) Ms. Cook would do anything to get high, even exchange sex for drugs;
(3) earlier that day, Mr. Hall had given Ms. Cook money to buy drugs; (4) immediately before the
robbery, Ms. Cook asked the victim for money so she could buy more drugs; and (5) the victim
refused her request for money (Doc. 14, Ex. B at 51-52).  Furthermore, in her cross-examination of
Ms. Cook, counsel went into detail to show that Ms. Cook would do anything to get high.  In closing
argument, counsel emphasized that the State had to prove its case beyond a reasonable doubt, that
Ms. Cook was not a credible witness, and that the State had not proven that Petitioner was the robber
(Doc. 14, Ex. B at 281-86).

Additionally, the court instructed the jury that before it could find Petitioner guilty of each
charge, the State must prove each element of each crime beyond a reasonable doubt, including that
Derrick Williams took money from Billy Hall, that Derrick Williams intentionally struck Billy Hall
against his will, that Derrick Williams used a deadly weapon, that Derrick Williams entered a
structure owned by Billy Hall without permission, and that at the time of entry Derrick Williams

intended to commit robbery or theft (Doc. 14, Ex. B at 289-95).  The court also instructed the jury as follows:

> It is up to you to decide what evidence is reliable.  You should use your common sense in deciding which is the best evidence and which evidence should not be relied upon in considering your verdict.
>
> You may find some of the evidence not reliable or less reliable than other evidence.  You should consider how the witnesses acted as well as what they said.  Some things you should consider are:  Did the witness seem to have an opportunity to see and know the things about which the which [sic] testified?
>
> Did the witness seem to have an accurate memory?  Was the witness honest and straightforward in answering the attorney's questions?  Did the witness have some interest in how the case should be decided?  Does the witness' testimony agree with the other testimony and other evidence in the case?
>
> Has the witness been offered or received any money, preferred treatment or other benefit to get the witness to testify?  Had any pressure or threat been used against the witness that affected the truth of the witness' testimony[?]  Did the witness at some other time make a statement that is inconsistent with the testimony that he or she gave in court?  And was it proved that the witness had been convicted of a crime.
>
> You may rely upon your own conclusion about a witness.  A juror may believe or disbelieve all or any part of the evidence or the testimony of any witness.

(Doc. 14, Ex. B at 301-02).  These instructions were adequate for the jury to assess the credibility of Ms. Cook in light of her alleged involvement in the crimes and her motivation to point the finger at Petitioner.

Given the weight of the evidence, counsel's presentation of the issue during trial, and the other jury instructions concerning witness credibility, weight of the evidence, reasonable doubt, and burden of proof, it was not unreasonable for the state court to conclude that Petitioner failed to establish that his counsel performed unreasonably by failing to request the accomplice instruction, or that there was a reasonable probability that the result of the trial would have been different if the jury had been given the cautionary instruction.  Therefore, Petitioner is not entitled to federal habeas relief on this claim.

      B.    <u>Ground two:  Ineffective assistance of counsel for failure to request alibi instruction.</u>

(Doc. 1 at 4).  In Ground two, Petitioner contends he received ineffective assistance of counsel because defense counsel failed to request a jury instruction regarding the alibi defense.  Petitioner states that without the instruction, the jury did not know that the State's burden of proof "covers the defense of alibi" (*id.*).  Petitioner argues that counsel's failure to request the instruction shifted the burden of proof to Petitioner; and if counsel had requested the instruction, the result of the trial would have been different (*see* Doc. 1 at 4; Doc. 16 at 12-14).  Respondent concedes that Petitioner exhausted his state court remedies as to this claim (Doc. 14 at 12).

> 1.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

> 2.      Federal Review of State Court Decision

Petitioner presented this claim as his fourth ground for relief in his Rule 3.850 motion (Doc. 14, Ex. F at 9-10).   The state court's written opinion included the following evaluation of Petitioner's claim:

> The defendant's Ground 4, which contradicts his previous claim, alleges counsel was ineffective for failing to request an alibi instruction be read to the jury.  As with the previous claim, the Court finds the defendant fails to sustain his burden under Strickland.  The Court finds the actions by counsel regarding the witnesses and the argument put forth by the defense concerning the defendant's whereabouts on the night of the crimes negates any claim counsel acted ineffectively, effecting [sic] the outcome of the proceedings.  Counsel for the defendant avidly argued the fact that the defendant was not present at the scene of the crime and that he was with his girlfriend at the time the crimes were committed.  Attachment 4.  The defense called two witnesses, Lashondra Jones, the defendant's then girlfriend and now wife, and Rodney Virgil, to corroborate the alibi defense.  Attachment 5.  During closing argument, counsel argued to the jury that there was reasonable doubt justifying a not guilty verdict.  Accordingly, the defendant's claim fails to sufficiently show how the mere exclusion of the alibi instruction effected [sic] the outcome of the proceedings.  The jury was properly instructed on weighing the credibility of witnesses' testimony and the burden of proof the State had to achieve in order to convict the defendant.  See Attachment 6.  The argument and testimony put forth by the defense, as well as the jury instructions provided gave the jury substantial information concerning the alibi defense with which to deliberate.  The defendant's claim does not satisfy the second prong of Strickland by showing the defendant would have been found not guilty had the instruction been included.

(Doc. 14, Ex. F at 105-06).

The Florida standard jury instruction regarding an alibi defense is the following:

3.6(I) ALIBI

An issue in this case is whether defendant was present when the crime allegedly was committed.

If you have a reasonable doubt that the defendant was present at the scene of the alleged crime, it is your duty to find the defendant not guilty.

Florida Standard Jury Instructions in Criminal Cases, Fourth Ed., Pt. One:  General Instructions, Ch. 3 Final Charge to the Jury.

As noted by the state court, counsel argued in her opening statement and closing argument that Petitioner was not present when the crimes were committed (*see* Doc. 14, Ex. B at 49-50). Furthermore, on cross-examination of the State's witnesses and presentation of defense witnesses, counsel focused on the theory that Petitioner was at home when the robbery occurred.

Additionally, the trial court instructed the jury regarding the elements of the crimes charged, the credibility of witnesses, and that it was the State's burden to prove each element of each crime beyond a reasonable doubt.  The court further instructed the jury as follows:

> The defendant has entered a plea of not guilty.  This means that you must presume or believe that the defendant is innocent.  The presumption stays with the defendant as to each material allegation in the information through each stage of the trial unless it has been overcome by the evidence to the exclusion of and beyond a reasonable doubt.

> To overcome the defendant's presumption of innocence, the State has the burden of proving the crime with which the defendant is charged was committed and that the defendant is the person who committed the crime.  The defendant is not required to present evidence or to prove anything.
> . . . .
> The constitution requires the State to prove its accusations against the defendant.  It is not necessary for the defendant to disprove anything.  Nor is the defendant required to prove his innocence.  It is up to the State to prove the defendant's guilt  by evidence.

((Doc. 14, Ex. B at 299-300, 302).

Counsel's presentation of the case and the trial court's instructions clearly conveyed to the jury the State's burden of proving beyond a reasonable doubt that Petitioner, and not someone else, committed the crimes charged.  Therefore, Petitioner has failed to demonstrate a reasonable

probability that he would have been found not guilty if his counsel had requested the alibi instruction.  Accordingly, he is not entitled to relief on this claim.

     C.    <u>Ground three:  Ineffective assistance of counsel due to failure to allow Petitioner to testify on his own behalf.</u>

(Doc. 1 at 5).  In Ground three, Petitioner contends he received ineffective assistance of counsel because defense counsel misadvised him regarding his right to testify on his own behalf (*id*.).  Petitioner states he told counsel he wished to testify, and counsel advised him not to (*id*.).  Petitioner states counsel failed to inform him that the final decision was Petitioner's, and he (Petitioner) did not know that he could contravene counsel's advice (*id*.).  Petitioner further states that he answered questions by the trial judge "as his attorney told him to" (Doc. 16 at 15).  Petitioner alleges that he would have testified as follows:  (1) he never telephoned Ms. Cook except to respond to the first page he received from her; (2) he had stopped dealing with Ms. Cook three months prior because she was a "snitch," and he told her not to contact him again; and (3) in jail he met a man named Michael Johnson who sold drugs to Ms. Cook and fit the physical description of the perpetrator given by the victim (*id.* at 15-16).  Petitioner alleges there is a reasonable probability that the result of his trial would have been different if he had testified (*see* Doc. 1 at 5).  Respondent concedes that Petitioner exhausted his state court remedies as to this claim (Doc. 14 at 14).

     1.     Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

     2.     Federal Review of State Court Decision

Petitioner presented this claim as his tenth ground for relief in his Rule 3.850 motion (Doc. 14, Ex. F at 15).  The state court's written opinion included the following evaluation of Petitioner's claim:

> The defendant's final claim, Ground 10 alleges counsel was ineffective for failing to allow the defendant to testify.  This claim is refuted by the trial transcript which shows that when the defendant elected not to testify, the Court conducted the proper colloquy to determine it was in fact the defendant's voluntary and intelligent choice.  <u>Attachment 14</u>.  This claim was also raised in the defendant's motion for new trial.  At the hearing on that motion, the Court found counsel's advice to not to [sic] testify was in fact good advice and that it was good [sic] decision by the defendant not to testify.  The Court also questioned the defendant's credibility as he was now claiming he did not answer her questions truthfully during the colloquy at

trial regarding his decision not to testify but that he is now being honest with the Court.  Attachment 1 - Pg. 25.  There is no additional information provided by the defendant in his motion for post-conviction relief which shows his decision to not testify was involuntary.  The defendant took counsel's advice, which was good advice given the evidence against the defendant, specifically, the phone record which could be used to impeach his testimony.  See Attachment 1 - Pgs. 25-26.  The fact that this decision did not result in an acquittal does not mean counsel was ineffective.

(Doc. 14, Ex. F at 109-10).

The state court correctly noted that Petitioner's proffered trial testimony that he never telephoned Ms. Cook except to respond to the first page he received from her, and that he had stopped dealing with Ms. Cook three months prior to the robbery because she was a "snitch," would have been impeached with the records from Petitioner's cellular phone which showed that at 7:02 on August 1, he received a call from Billy Hall's cellular phone, and later in the evening he received five more calls from that phone, one of which occurred at 10:04 p.m. and lasted over five minutes (see Doc. 14, Ex. B at 219-21).  Therefore, the state court's conclusion that defense counsel properly advised Petitioner not to testify was reasonable under Strickland.

Additionally, the trial transcript shows that defense counsel initially announced that Petitioner would be testifying, but later informed the judge that he would not (Doc. 14, Ex. B at 254, 255). Outside the presence of the jury, the court conducted the following colloquy with Petitioner regarding his decision not to testify:

THE COURT:          . . . Mr. Williams, I do need to make a brief inquiry of you before we proceed.

You had initially indicated that you did want to testify, and I wanted to inform you that you do have an absolute constitutional right to testify in this trial if you chose to do so.

Now obviously that's a very important decision and it is a decision that should be made after you confer with counsel.  Have you had the opportunity to confer with your attorney about whether you should testify in this trial or not?

THE DEFENDANT:  Your Honor, I would like just a few more minutes to consult with my counsel about that.

THE COURT:          Okay.

(BRIEF PAUSE)

THE DEFENDANT:  No, ma'am; I'm not going to testify.

THE COURT:        Okay.  Now what I need to make certain, Mr. Williams, is that you are comfortable with that decision.  I sense that you perhaps thought you would testify and now you've changed your mind, which is certainly fine.  I don't want to suggest that there's anything good or bad about testifying.

And obviously there are some very strong pros and cons about testifying.  But are you comfortable with your decision now not to testify?

THE DEFENDANT:  Yes, ma'am.

THE COURT:        Okay.  And what I also need to insure, Mr. Williams, is that that is your decision and not your attorney's decision; is that correct?

THE DEFENDANT:  Yes, ma'am.

(Doc. 14, Ex. B at 271-72).  Furthermore, at the hearing on Petitioner's motion for new trial, the court found that Petitioner's assertion that he did not answer truthfully during the colloquy regarding his decision not to testify, and that his decision not to testify was involuntary, was not credible (*id*. at 137-38).   Moreover, Petitioner presented no additional facts showing that his decision not to testify was involuntary or based upon improper advice by his counsel.  Therefore, the state court's conclusion that Petitioner's counsel did not perform deficiently in advising Petitioner regarding his right to testify was not an unreasonable application of <u>Strickland</u> or based upon an unreasonable determination of the facts.

D.      Ground four:  The State committed a Giglio/Brady violation by allowing Ms.
        Cook to testify falsely.

(Doc. 1 at 5).  Petitioner next contends the State committed a Giglio/Brady[8] violation by knowingly

allowing Ms. Cook to falsely testify that she was not promised leniency by the State in exchange for

her testimony (id.; Doc. 16 at 16-17).  Petitioner asserts that Ms. Cook had an agreement with the

State that if she testified, she would receive a favorable plea bargain (id. at 16).  He states that at his

sentencing hearing, over two months after his trial, his pre-sentence investigation report stated that

Ms. Cook had received a probationary sentence of five years for her role in the robbery (Doc. 1 at

5).

        Respondent contends that Petitioner did not fairly present this issue to the state courts and

is now procedurally barred from doing so (Doc. 14 at 15).  Therefore, the claim is procedurally

defaulted for purposes of federal habeas review (id.).  Petitioner states that he raised this claim in

his motion for rehearing of his Rule 3.850 motion "in conjunction of [sic]" Ground 5 of his Rule

3.850 motion (see Doc. 1 at 5).

        Upon review of the state court record, the undersigned concludes that Petitioner did not

exhaust his Brady/Giglio claim in the state courts.  In Ground 5 of Petitioner's Rule 3.850 motion,

Petitioner claimed he received ineffective assistance of counsel because defense counsel failed to

subpoena letters written by Ms. Cook to Mr. James Colston in which Ms. Cook allegedly stated she

was offered a deal by the State to testify against Petitioner (Doc. 14, Ex. F at 10).  Petitioner

included the following reference in his argument that he was prejudiced by counsel's error:  "Had

counsel had the letters subpoenaed, the jury would have known that Ms. Cook was being offered

leniency in exchange for her testimony and that the State was making her implicate defendant, as

well as the State knew Ms. Cook's testimony was perjured" (see Doc. 14, Ex. F at 15-16).  However,

he did not state an independent claim of a Brady/Giglio violation.  Furthermore, although Petitioner

alleged that the State committed a Brady violation in his discussion of Ground Four in his motion

for rehearing of the trial court's denial of his Rule 3.850 motion (see id. at 278), this did not satisfy

the "fair presentment" requirement as Florida law provides that a defendant may not obtain a merits

_____

        [8]Petitioner is referring to Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) and Giglio
v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

review of a claim raised for the first time in a motion for rehearing.  *See* <u>Cave v. State</u>, 899 So. 2d 1042, 1052 (Fla. 2005) (where defendant did not raise claim of newly discovered evidence in motion for post-conviction relief, and instead raised claim for first time in motion for rehearing following circuit court's order denying relief, issue was not properly presented to lower court and, therefore, was not cognizable on appeal of decision denying post-conviction motion).  Petitioner's failure to present his <u>Brady/Giglio</u> claim until now means that he deprived the state courts of "the first opportunity to hear the claim[ ] sought to be vindicated in a federal habeas proceeding. "  <u>Bailey</u>, 172 F.3d at 1305 (internal quotation omitted).  Furthermore, this court applies the familiar principle that "federal courts may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile."  *Id.*

        In the instant case, Petitioner's failure to raise his <u>Brady/Giglio</u> claim in his first Rule 3.850 motion in the Florida courts bars him from raising the argument in a successive motion.  *See* <u>Turner v. Crosby</u>, 339 F.3d 1247, 1281 (11th Cir. 2003) (citing <u>Mills v. Florida</u>, 684 So.2d 801, 804 n. 3 (Fla. 1996); <u>Spaziano v. State</u>, 545 So.2d 843, 844 (Fla. 1989) ("Unless petitioner shows justification for failure to raise the present issue in the first petition, the second successive petition pursuant to Florida Rule of Criminal Procedure 3.850 may be dismissed as an abuse of procedure."); <u>Snowden v. Singletary</u>, 135 F.3d 732, 736 n.4 (11th Cir. 1998)).  However, Petitioner may escape the procedural default doctrine either through showing "cause for the default and prejudice" or establishing a "fundamental miscarriage of justice."  <u>Bailey</u>, 172 F.3d at 1306 (quotation marks and citation omitted).  "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court."  <u>Wright v. Hopper</u>, 169 F.3d 695, 703 (11th Cir. 1999).  "In order to establish prejudice, [a petitioner] must show that the items of evidence were material; that is, that 'had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Id.* (citation omitted).  "In order to show the type of 'miscarriage of justice' that will excuse a procedural bar, a petitioner must make a colorable showing of actual innocence."  <u>Isaacs v. Head</u>, 300 F.3d 1232, 1255 (11th Cir. 2002) (citation and quotations omitted).  In the instant case, Petitioner does not allege cause for his failure to assert his <u>Brady/Giglio</u> claim in his first post-conviction motion.

Furthermore, he has failed to make a colorable showing of actual innocence.  Thus, the undersigned concludes that federal review of Petitioner's <u>Brady/Giglio</u> claim is procedurally barred.

> E.      <u>Ground five:  Ineffective assistance of counsel for failure to investigate and call witness Michael Johnson who told defendant he sold cocaine to Ms. Cook on Bicycle Road.</u>

> <u>Ground six:  Ineffective assistance of counsel for failure to object to witness' testimony of prior bad acts.</u>

> <u>Ground seven:  Ineffective assistance of counsel for failure to have letters subpoenaed which would show Ms. Cook's testimony was perjured.</u>

> <u>Ground eight:  Ineffective assistance of counsel for failure to object to improper prosecutorial remark.</u>

> <u>Ground nine:  Ineffective assistance of counsel for failure to object to improper questioning by State concerning nature of defense witness' prior convictions.</u>

> <u>Ground ten:  Ineffective assistance of counsel for failure to impeach Ms. Cook using extrinsic evidence.</u>

> <u>Ground eleven:  Ineffective assistance of counsel for failure to object to imposition of 10-year minimum mandatory sentence for possession of firearm, where State failed to establish firearm.</u>

(Doc. 1 at 6-9).  In his reply to Respondent's answer to the habeas petition, Petitioner concedes that he cannot satisfy the deficient performance prong of the <u>Strickland</u> standard on his remaining individual claims (<i>see</i> Doc. 16 at 17).  However, he argues that the cumulative effect of these alleged errors deprived him of effective assistance of counsel under <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) (<i>id</i>.).

Initially, Petitioner does not allege, nor does the state court record show, that Petitioner raised in the state courts a claim that the cumulative effect of counsel's alleged errors deprived him of a fair trial.  Furthermore, as discussed <i>supra</i>, any attempt by Petitioner to return to state court and present his claim in a second Rule 3.850 motion would be futile in light of the state procedural rule barring successive motions, and Petitioner has failed to make any of the requisite showings to excuse his default.

Overlooking the procedural bar on this new claim, the claim is without merit.  As previously discussed with regard to Grounds one through three, and as conceded by Petitioner with regard to Grounds five through eleven, none of the alleged errors of trial counsel, considered alone, satisfy the threshold standard of ineffective assistance of counsel.  Taken together and examining counsel's overall performance, the cumulative effect of the alleged errors also falls far short of depriving Petitioner of effective assistance of counsel or of rendering Petitioner's trial fundamentally unfair.  The remaining claim of a <u>Brady/Giglio</u> error is not entitled to federal habeas review because it was procedurally defaulted.  Therefore, Petitioner is not entitled to relief on his claim of cumulative error.  *See* <u>Bronstein v. Wainwright</u>, 646 F.2d 1048 (11th Cir. 1981) ("[A] state trial must be so 'fundamentally unfair' as to amount to a denial of due process before federal habeas relief can be appropriately applied.") (internal quotation and citation omitted).

Based upon the foregoing, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that James R. McDonough is substituted for James V. Crosby, Jr. as Respondent.

And it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

At Pensacola, Florida, this <u>8th</u> day of December 2006.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**